# EXHIBIT A

JM:SC:SJM
F.#2010R00319

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

LEND LEASE (US) CONSTRUCTION LMB
INC. (formerly BOVIS LEND LEASE
LMB INC.),

         Defendant.

- - - - - - - - - - - - - - - - -X

Cr. No.    12-288

## DEFERRED PROSECUTION AGREEMENT

      The defendant LEND LEASE (US) CONSTRUCTION LMB INC.
(formerly BOVIS LEND LEASE LMB INC.) ("Bovis"), by its
undersigned attorneys, pursuant to authority granted by its Board
of Directors in the form of a Board Resolution (a copy of which
is attached hereto as Exhibit A), and the United States
Attorney's Office for the Eastern District of New York (the
"Office") hereby enter into this Deferred Prosecution Agreement
(the "Agreement").  Except as specifically provided below, and in
accordance with the provisions specified in paragraphs 14 through
24 below, this Agreement shall be in effect for a period of 24
months.

### Information

      1.  The United States will file an Information (the
"Information") in the United States District Court for the

Eastern District of New York charging Bovis with three counts of
conspiracy to commit mail and wire fraud, all in violation of
Title 18, United States Code, Section 1349.  By executing this
Agreement, Bovis waives any and all rights it has to have the
crimes charged in the Information presented to a Grand Jury and
prosecuted by indictment and waives any and all objections to
venue.  This waiver is knowing, voluntary and in express reliance
on the advice of Bovis's counsel.

Acceptance of Responsibility

2.   Bovis accepts and acknowledges as true the facts
set forth in the Information (a copy of which is attached hereto
as Exhibit B), which is incorporated herein by reference.  Bovis
acknowledges that, through the conduct of certain Bovis
executives, officers and employees during the relevant time
period, Bovis engaged in, and is criminally culpable for, the
charged violations of Title 18, United States Code, Section 1349.

3.  Bovis accepts responsibility for the conduct set
forth in the Information by entering into this Agreement and by,
among other things: (a) the remedial actions that Bovis has taken
to date and will take (described in paragraph 4 below); (b)
Bovis's continuing commitment to full cooperation (described in
paragraphs 5, 6 and 7 below) with the Office and its law
enforcement agency partners; (c) Bovis's agreement to fulfill all
of the undertakings Bovis has made in this Agreement, including

2

(i) to pay a financial penalty in the amount of $40.5 million,[1] (ii) to continue to pay restitution up to a total amount of $13,645,752[2] to the victims of the overbilling scheme outlined in Count One of the Information, (iii) to pay restitution of $1.5 million to the victim of the fraudulent scheme outlined in Count Two of the Information, (iv) to pay restitution of $1 million to the victim of the fraudulent scheme outlined in Count Three of the Information, and (v) to implement enhanced internal controls as set forth herein; and (d) Bovis's agreement to comply in the future with all federal and state criminal laws.

4. Bovis represents that its parent company Lend Lease Corporation Limited ("Lend Lease") and the Boards of Directors and current senior management of both Bovis and Lend Lease have taken a number of remedial actions in response to the misconduct at Bovis that has been discovered in the course of the Office's investigation. These remedial actions have included and will include:

(a) terminating or securing the resignation of Bovis officers and employees who were responsible for the conduct

---

[1]    The United States acknowledges that Bovis previously paid $5 million to the City of New York as a settlement with respect to a portion of the same conduct covered by this case. The government credits $4 million of that settlement against the $40.5 million penalty in this case.

[2]    To the extent Bovis has already made restitution payments to these victims, those payments will be deducted from the amount of restitution due under this agreement.

set forth in the Information;

 (b) reducing the responsibilities of other Bovis officers and employees who were otherwise involved in the conduct set forth in the Information;

 (c) making relevant organizational changes, including (i) creating the position of Ethics and Compliance Officer, whose appointment and termination must be approved by the Board of Directors of Lend Lease (the "Board of Directors"), and who reports to the General Counsel of Lend Lease Americas ("LLA") and has direct and full access to the Board of Directors, (ii) creating a LLA Regional Risk and Compliance Committee, and (iii) implementing enhancements to the Procurement Team, including a Small/Minority Business Enterprise Compliance component;

 (d) revising the Code of Conduct, Time Sheet/Billing and Minority Business Enterprise, Disadvantaged Business Enterprise, Women-Owned Business Enterprise and Small Business Enterprise (collectively "MDWSBE") policies, including implementing the LLA Regional Ethics and Compliance Plan, to require and ensure that: (i) union labor hours are accurately recorded on time sheets and clients are only billed for hours worked; (ii) certified payrolls accurately reflect the hours worked by all union labor; (iii) all of the MDWSBEs with which Bovis has a subcontract, or will have a subcontract, are required

to comply with all applicable rules and regulations, including but not limited to the requirement that MDWSBEs perform a "commercially useful function;"

(e) providing effective training on the Code of Conduct, Time Sheet/Billing and MDWSBE policies, including the requirements and revisions identified in paragraph 4(d) above, to all relevant Bovis officers and employees, and notifying union labor used by Bovis that only hours actually worked are permitted to be recorded on their time sheets;

(f) continuing the enforcement of enhanced union time sheet recording and billing procedures. Specifically, Bovis will, pursuant to formal written policy:

    i.       only permit hours actually worked to be recorded on time sheets and paid to Bovis union workers;

    ii.     notify its subcontractors that only hours actually worked are permitted to be recorded on time sheets and paid to the subcontractor's union workers;

    iii.    require each of Bovis's union workers to certify the accuracy of all hours recorded on his or her time sheet. For projects that receive any public funding, the time sheet shall contain a warning that the information provided on the time sheet will be provided to the federal government and that any false statement could constitute a violation of 18 U.S.C. § 1001;

    iv.    require that each of Bovis's union worker's time sheets be approved by the foreman, site superintendent and project manager and that each foreman's time sheet be approved by the site superintendent and project manager;

v.          require Bovis's foremen and site
            superintendents to maintain independent daily
            records to verify the accuracy of the time
            sheets;

vi.         require Bovis's foremen, site superintendents
            and project managers to review time sheets
            with other project-related documents to
            verify the accuracy of hours entered.

In addition, Bovis will:

vii.        train Bovis site superintendents and project
            managers on the requirements of a certified
            payroll on public works, or publicly funded,
            projects; and

viii.       maintain a full-time auditor position based
            in the New York office, whose primary
            function during the 24-month period that this
            Agreement is in effect is to verify that the
            union time sheet recording and billing
            procedures are being followed at all levels.
            This auditor's main focus will be the New
            York office, but will also have authority to
            review other LLA offices.  The auditor will
            conduct regular visits to the project sites,
            observe actual procedures being followed at
            the site, and inquire from union workers,
            site superintendents and project managers
            about their actual implementation of the time
            sheet and billing procedures.  The auditor
            will also conduct regular reviews of the
            union hours in an attempt to spot unexplained
            trends, anomalies or other indicia of
            problems.  The auditor will report to the
            Finance Director and will coordinate audit
            activities with, and provide reports to, the
            Ethics and Compliance Officer.  Bovis will
            provide an update to the Office of the
            auditor's activities and findings every six
            months, or more often upon request of the
            Office, during the deferral period;

(g) implementing additional controls designed to

ensure that all MDWSBEs used by Bovis as subcontractors provide a

6

"commercially useful function" in fulfilling MDWSBE Program goals

as set forth in all contracts in which Bovis is currently

involved or becomes involved, except where the public contracting

agency has provided a written waiver concerning MDWSBE use.

Specifically, Bovis will, subject to the requirements of Bovis's

contract with the client:

    i.        disallow, prohibit and prevent the transfer of personnel from Bovis to any MDWSBE that subcontracts with Bovis or its venture partners or subcontractors with respect to the performance of a specific contract;

    ii.       ensure that the MDWSBE is responsible for the execution of the work required under the contract, and that the MWDBE is carrying out its responsibilities by actually performing, managing, and conducting such work;

    iii.     ensure that the MDWSBE's role is not limited to that of an extra participant, pass-through or conduit in a contract, through which funds are passed in order to obtain the appearance of MDWSBE participation and that the MDWSBE is not used for the sole purpose of providing payroll and invoice processing services unless specified for that role in the contract;

    iv.       verify that the MDWSBE is independently capable of performing the work specified in its contract.  If Bovis later becomes aware that the MDWSBE is no longer capable of independently performing the work specified in the contract, Bovis will notify the client of the changed circumstances and the remedial actions that Bovis plans to take;

    v.        not seek MDWSBE credit for time and money spent by Bovis negotiating prices and quantities of materials, ordering materials, and paying for materials to be used by the MDWSBE;

vi.     allow and enable potential MDWSBE subcontractors to participate independently in bidding, contracting and performing work on projects with which Bovis is involved and where MDWSBE involvement is required under Bovis's contract; and

vii.    create a MDWSBE liaison position based in the New York office, whose function is to actively ensure that Bovis is meeting its federal, state and local MDWSBE obligations. The MDWSBE liaison will regularly meet with federal, state and local agency clients to discuss the agencies' expectations and implementation of the MDWSBE programs on a project-by-project basis. To this end, the MDWSBE liaison will play an active role in the process by which Bovis engages qualified MDWSBEs and uses best efforts to verify that each MDWSBE is able to independently perform the duties it is being subcontracted to perform and provide a commercially useful function in accordance with its responsibilities under its contract. The MDWSBE liaison will report to the Ethics and Compliance Officer.

## Continuing Obligation of Cooperation

5. Bovis acknowledges and understands that its prior, ongoing and future cooperation is an important and material factor underlying the Office's decision to enter into this Agreement, and therefore, Bovis agrees to continue to cooperate fully and actively with the Office and the New York County District Attorney's Office ("DANY") regarding any matter about which the Office or DANY may inquire.

6. During the term of this Agreement, Bovis agrees that its continuing cooperation shall include, but not be limited to, the following:

(a) completely and truthfully disclosing all information in its possession to the Office regarding any and all matters about which the Office may inquire, including but not limited to all information about activities of Bovis and Bovis's officers, employees and agents;

(b) assembling, organizing and providing all documents, records and other evidence in Bovis's possession, custody or control, as reasonably may be requested by the Office;

(c) proactively disclosing to the Office all information concerning any criminal wrongdoing or suspected criminal wrongdoing beyond that specifically addressed in the attached Information, which has not yet been explicitly disclosed to the Office, and which is either currently in Bovis's possession or which may come into its possession in the future, including conduct of the type alleged in the Information;

(d) using its reasonable best efforts to make available its present and former officers and employees to provide information and/or testimony as requested by the Office, including sworn testimony before a grand jury or in court proceedings, as well as interviews with law enforcement authorities.  Cooperation under this paragraph shall include

9

identification of witnesses who, to Bovis's knowledge and information, may have material information concerning the conduct set forth in the Information;

(e) providing testimony or information necessary to identify or establish the original location, authenticity or other basis for admission into evidence of documents or physical evidence in any criminal or other proceeding as requested by the Office, concerning the conduct set forth in the Information;

(f) with respect to any information, testimony, documents, records or physical evidence provided by Bovis to the Office and/or a grand jury, consenting to any and all disclosures of such materials to such agencies as the Office, in its sole discretion, deems appropriate.  With respect to any such materials that constitute "matters occurring before the grand jury" within the meaning of Rule 6(e) of the Federal Rules of Criminal Procedure, Bovis further consents to: (i) any order sought by the Office permitting such disclosures; and (ii) the Office's ex parte or in camera application for such orders; and

(g) providing active assistance, including assistance by Bovis's counsel, in connection with any investigation, criminal prosecution, civil trial or other legal proceeding brought by the Office.

7.  Bovis agrees that it will continue to fulfill the cooperation obligations set forth in paragraph 6 above in

connection with any investigation, criminal prosecution and/or civil proceeding brought by the Office relating to or arising out of the conduct set forth in the Information. Bovis's obligation to cooperate is not intended to apply in the event that Bovis is a defendant in any such proceeding. Notwithstanding the foregoing, Bovis does not waive any privilege it may have with respect to any documents now or hereafter subject to the attorney-client privilege, the attorney work-product doctrine or other recognized legal privilege.

### Payment of a Financial Penalty to the United States

8. In addition to any payments required in connection with any current or future non-criminal proceedings, by agencies not party to this agreement or by branches of the Department of Justice other than the Office, Bovis agrees to pay $40.5 million to the United States as a financial penalty as directed by the Office. Bovis agrees to pay the penalty according to the following schedule: the first $13 million payment within 90 days of the date of the execution of this Agreement; the second $13 million payment within one year of the date of the execution of this Agreement; and the remaining balance within two years of the execution of this Agreement. The United States acknowledges that Bovis has already paid $4 million of this penalty as part of its settlement with the City of New York with respect to a portion of the same conduct covered by this case.

11

Payment of Restitution

9.   In addition to any payments required in connection with any current or future non-criminal proceedings by agencies not party to this agreement or by branches of the Department of Justice other than the Office, Bovis agrees to make restitution to the victims of the three schemes outlined in the Information as set forth below.  With respect to the victims of Count One of the Information, Bovis will make an offer of restitution to each victim in the amounts agreed to by the parties.  To the extent Bovis has already made restitution payments, those payments will be deducted from the offers of restitution to be made.

(a)   Within 30 days of the date of execution of this Agreement, Bovis will contact each victim of Count One that is eligible for restitution via letter, the contents of which must be approved by the Office.  Bovis will advise each victim that restitution is available in the amount agreed to by the parties.

(b)   To the extent that any victim of Count One declines to claim the offered restitution within 12 months of the date of execution of this Agreement, Bovis will be absolved of this Agreement's requirement to pay such restitution.

10.   With respect to Count Two of the Information, Bovis will pay restitution of $1.5 million within 60 days of the date of execution of this Agreement.

12

11.   With respect to Count Three of the Information, Bovis will pay restitution of $1 million within 60 days of the date of execution of this Agreement.

12.   Bovis agrees that it will not, in connection with the financial penalty described in paragraph 8, seek, obtain or accept any reimbursement or other payments or credits from any insurer of Bovis or of any of its divisions or subsidiaries. Bovis also agrees that it will not seek, obtain or accept any tax deduction in connection with the financial penalty described in paragraph 8.

<u>Corporate Reforms</u>

13.   Bovis agrees: (i) that any policies, procedures or other remedial measures identified in paragraph 4 that have not already been implemented will be implemented within 30 days following the date of the execution of this Agreement, except that the new positions required under Paragraph 4(f)(viii) and 4(g)(vii) will be filled within 60 days following the date of the execution of this Agreement (as may be extended with the prior written approval of the Office); (ii) that it will maintain all policies, procedures and other remedial measures identified in paragraph 4 so long as this Agreement is in effect; and (iii) that it will retain all documentation generated in connection with the revised billing procedures so long as this Agreement is in effect.  As a material part of this

13

agreement, Bovis further agrees that it will not violate any federal or state criminal laws during the deferral period.

## Deferral of Prosecution

14. In consideration of Bovis's remedial actions to date and its commitment to (a) accept and acknowledge responsibility for its conduct, (b) continue its cooperation with the Office, (c) make the payments specified in paragraphs 3 and 8 through 11 above, (d) comply with federal and state criminal laws and (e) otherwise comply with all of the terms of this Agreement, the Office shall, at the time it files the Information, simultaneously file a joint motion with Bovis pursuant to Title 18, United States Code, Section 3161(h)(2), to defer the prosecution for a period of 24 months and to obtain an exclusion of time under the Speedy Trial Act to allow Bovis to demonstrate good conduct and compliance with the terms of this Agreement (the "§ 3161(h)(2) Motion"). By executing this Agreement and joining in the § 3161(h)(2) Motion, Bovis expressly waives all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Sections 3161 et seq., Federal Rule of Criminal Procedure 48(b), and any other applicable statutes or rules, including the Local Rules of the United States District Court for the Eastern District of New York for the period during

14

which this Agreement is in effect.  This waiver is knowing,
voluntary and in express reliance on the advice of Bovis's
counsel.

15.  The Office agrees that, if Bovis remains in
compliance with all of its obligations under this Agreement for
the 24-month period identified in paragraph 14, this Agreement
shall expire, and the Office will, within 30 days of the
expiration of this Agreement, move the Court pursuant to Federal
Rule of Criminal Procedure 48(a) to dismiss the Information with
prejudice.  Except in the event of a breach of this Agreement,
the Office will bring no additional charges against Bovis
relating to or arising out of the matters set forth in the
Information.

16.  It is further understood that, should the Office
determine that Bovis has deliberately given materially false,
incomplete or misleading information pursuant to this Agreement,
has committed any crimes subsequent to the date of this
Agreement or has otherwise knowingly, intentionally and
materially violated any provision of this Agreement, Bovis
thereafter shall be subject to prosecution for any crimes of
which the Office has knowledge.  Any such prosecution may be
premised on any information provided by or on behalf of Bovis to
the Office or its law enforcement agency partners at any time.
Moreover, Bovis agrees that any such prosecution relating to the

15

allegations in the Information that are not time-barred as of
the date of the execution of this Agreement may be commenced
against Bovis, notwithstanding the expiration of any applicable
statute of limitations between the execution of this Agreement
and the expiration of this Agreement under paragraph 15.   By
this Agreement, Bovis expressly intends to and does waive any
and all rights in this respect.   Such waiver is knowing,
voluntary and in express reliance on the advice of Bovis's
counsel.

   17.   It is further agreed that, in the event that the
Office determines that Bovis has knowingly, intentionally and
materially violated any provision of this Agreement:

   (a)  this agreement and the Information are
admissible in any future court proceedings by this Office
against Bovis as an admission by Bovis; all statements made by
or on behalf of Bovis or any of its officers, directors or
employees to the Office, its law enforcement agency partners and
DANY, including its admission that the facts set forth in the
Information are true and accurate, and/or any testimony given by
Bovis or any of its officers, directors or employees before a
grand jury or elsewhere, whether before or after the date of
this Agreement, and any leads derived from such statements or
testimony, shall be admissible in evidence in any and all
criminal proceedings brought by the Office against Bovis; and

(b) Bovis shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence or any other statute or federal rule that statements made by or on behalf of Bovis before or after the date of this Agreement, or any leads derived therefrom, should be suppressed. However, nothing in the Agreement shall constitute a waiver of any Confrontation Clause rights under the Sixth Amendment to the United States Constitution that Bovis may have.

18. Bovis agrees that it shall not, through its attorneys, Board of Directors, agents, officers or employees, make any public statement, in litigation or otherwise, contradicting the facts set forth in the Information, its admission that those facts establish the elements of the offenses charged in the Information, and its acceptance of responsibility for the acts of its executives, officers and employees described in the Information. Any such contradictory statement by Bovis, its present or future attorneys, Board of Directors, agents, officers or employees shall constitute a breach of this Agreement, and, subject to cure as hereinafter provided, Bovis thereafter shall be subject to prosecution as specified in paragraphs 14 through 17. The decision as to whether any such contradictory statement will be imputed to Bovis for the purpose of determining whether Bovis has breached

17

this Agreement shall be committed to the sole discretion of the Office. Upon the Office's notifying Bovis of any such contradictory statement, Bovis may avoid a finding of a breach of this Agreement by publicly repudiating such statement within 72 hours after receipt of notice by the Office. This Paragraph is not intended to apply to any statement made by any former Bovis officer, director or employee, or by any current Bovis officer, director or employee who is under investigation or is or has been charged with a crime or other wrongdoing by the government or an agency thereof.

19. Bovis agrees that the decision whether conduct and/or statements of any individual will be imputed to Bovis for the purpose of determining whether Bovis has knowingly, intentionally and materially violated any provision of this Agreement shall be committed to the sole discretion of the Office, provided, however, that the statements of any former officer, director or employee of Bovis made after their employment with Bovis has ended shall not be attributed to Bovis for such purpose. Should the Office determine that Bovis has committed a knowing, intentional and material breach of any provision of this Agreement, the Office shall provide written notice of the alleged breach to Bovis, addressed to its General Counsel and to Bovis's counsel, Steven Reiss, Esq. of Weil Gotshal & Manges LLP, or to any successor that Bovis may

designate, and provide Bovis with a two-week period from the
date of receipt of such notice in which to make a presentation
to the Office, or its designee, to demonstrate that no breach
has occurred, or, to the extent applicable, that the breach was
not knowing, intentional or material, or has been cured.  Upon
request by Bovis, the Office may agree in writing to extend this
two-week period, including to provide Bovis with an opportunity
to cure any breach of this Agreement.  The parties to this
Agreement expressly understand and agree that should Bovis fail
to make a presentation to the Office, or its designee, within
the two-week period (or other period agreed to by the Office),
the Office may conclusively presume that Bovis is in knowing,
intentional and material breach of this Agreement. The parties
further understand and agree that the exercise of discretion by
the Office or its designee under this paragraph is not subject
to review in any court or tribunal or any other office within
the United States Department of Justice.

        20.  Except to the extent permitted by the Office,
Bovis agrees that, if it sells or merges all or substantially
all of its business operations as they exist as of the date of
this Agreement to, or into, a single purchaser or group of
affiliated purchasers during the term of this Agreement, Bovis
shall include in any contract for sale or merger a provision
binding the purchaser/successor to Bovis's obligations described

in this Agreement.  Such purchaser/successor shall also have the

benefits, privileges and rights conferred to Bovis under this

Agreement.

21.  It is understood that this Agreement is binding

on Bovis, the Office and DANY, but specifically does not bind

any other federal agencies, any state or local law enforcement

agencies, any licensing authorities or any regulatory

authorities.  However, if requested by Bovis or its attorneys,

the Office will bring to the attention of any such agencies,

including but not limited to any licensing authorities, the

Agreement, the extensive cooperation of Bovis and its compliance

with its obligations under this Agreement, and any corporate

reforms specified in this Agreement.  It is the intent of the

parties to this Agreement that the Agreement does not confer or

provide any benefits, privileges or rights to any individual or

other entity other than the parties hereto, and that nothing in

the Agreement shall be construed as acknowledging that the

Agreement, including the Information and the evidence underlying

the Agreement or Information, shall be admissible in any

proceeding other than a proceeding brought by the Office.

Moreover, Bovis may raise any and all defenses and/or assert

affirmative claims in any civil proceedings brought by third

parties as long as doing so does not otherwise violate any term

of this Agreement.

22.   The Office has concluded that deferring prosecution is appropriate because deferral will likely meet all of the goals of prosecution.   This conclusion is based on Bovis's extensive cooperation; its acceptance of responsibility; the remedial actions already voluntarily taken by Bovis; the remedial actions Bovis has committed to undertake in this Agreement; and Bovis's assurances that it intends to become a model of integrity in the construction industry in New York City.

23.   Bovis and the Office agree that, upon the filing of the Information in accordance with paragraphs 1 and 14, this Agreement (including its attachments) shall be publicly filed in the United States District Court for the Eastern District of New York.

24.   This Agreement sets forth all the terms of the Deferred Prosecution Agreement between Bovis, the Office and DANY.   In consideration for Bovis's promises and obligations set forth in this Agreement, DANY agrees to be bound by this agreement to the same extent, and in the same manner, as the Office.   No modifications or additions to this Agreement shall

be valid unless they are in writing and signed by the Office,

Bovis's attorneys and a duly authorized representative of Bovis.

Dated:    Brooklyn, New York
          April 23, 2012

                              LORETTA E. LYNCH
                              United States Attorney
                              Eastern District of New York

                    By:    _____
                              Marshall Miller
                              Chief, Criminal Division

                           _____
                              Sarah Coyne
                              Deputy Chief, Business and
                              Securities Fraud Section

                              Stephen J. Meyer
                              Assistant U.S. Attorney


                              CYRUS R. VANCE, JR.
                              District Attorney
                              New York County

                    By:    _____
                              Brian Fields
                              Assistant District Attorney



AGREED AND CONSENTED TO BY:

_____
LEND LEASE (US) CONSTRUCTION LMB INC.
(formerly BOVIS LEND LEASE LMB INC.)
Defendant

_____
Steven Reiss, Esq.
Weil Gotshal & Manges LLP

# Exhibit A

**CONSENT OF DIRECTORS IN LIEU OF SPECIAL MEETING OF THE BOARD OF DIRECTORS OF LEND LEASE (US) CONSTRUCTION LMB INC. (formerly BOVIS LEND LEASE LMB, INC.)**

Pursuant to Section 708(b) of the New York Business Corporation Law, in lieu of a special meeting of the Board of Directors of Lend Lease (US) Construction LMB Inc. ("the Corporation"), the undersigned, being the Directors of the Corporation, do hereby adopt, confirm and consent to the resolutions set forth below, such resolutions to be effective as if they had been adopted at a meeting of the Board of Directors duly called and held:

WHEREAS, the Corporation has agreed to enter into that certain Deferred Prosecution Agreement (the "DPA") between the Corporation and the United States of America dated as of April 23, 2012; and

WHEREAS, the Board of Directors of the Corporation have reviewed the DPA and approve the terms and conditions of such DPA;

NOW THEREFORE BE IT:

RESOLVED, that the DPA is hereby approved by the Board of Directors and the Corporation is hereby authorized to execute and deliver the DPA to the United States of America and the Corporation is authorized to perform its obligations arising from the DPA;

RESOLVED FURTHER, that any officer of the Corporation shall be and is hereby authorized, empowered and directed to execute, on behalf of the Corporation, the DPA in the form reviewed by the Board of Directors;

RESOLVED FURTHER, that any officer of the Corporation, shall be and is hereby authorized, empowered and directed to execute, on behalf of the Corporation, all documents and notices to be executed and delivered by the Corporation under or in connection with the DPA;

RESOLVED FURTHER, that all actions taken and expenses incurred by any director or officer of the Corporation heretofore in furtherance of any actions authorized by the foregoing resolutions hereby are expressly ratified, confirmed, adopted and approved in all respects, and the Board of Directors acknowledge that the resolutions contained herein may supersede prior resolutions adopted by the Board of Directors to the extent such resolutions are inconsistent with the actions taken herein.

IN WITNESS WHEREOF, the undersigned directors have executed this consent, to be effective as of April 23, 2012.

_____
Simon Benson

_____
Dale Connor

_____
Jeff Arfsten

# Exhibit B

JM:SC/SJM
F. #2010R00319

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

LEND LEASE (US) CONSTRUCTION LMB
INC. (formerly BOVIS LEND LEASE
LMB INC.),

              Defendant.

- - - - - - - - - - - - - - - - - -X

I N F O R M A T I O N

Cr. No.
(T. 18, U.S.C., §§ 1349
 and 3551 et seq.)

THE UNITED STATES ATTORNEY CHARGES:

INTRODUCTION TO ALL COUNTS

      At all times relevant to this Information, unless otherwise indicated:

I.   The Defendant

      1.    LEND LEASE (US) CONSTRUCTION LMB INC. (formerly BOVIS LEND LEASE LMB INC.) ("Bovis") was a construction service corporation that provided construction, project management and consulting services on large-scale public and private construction projects.  Bovis was a United States subsidiary of the company Lend Lease Corporation Limited ("Lend Lease"), which, as of 2009, operated in over 40 countries in Asia and Europe, as well as in Australia and the United States.

      2.    Bovis was one of the largest construction firms in New York City.  Bovis operated primarily in the northeast region of the United States, and its New York office was the largest of

2

its offices.  In 2008, Bovis had over 1,000 employees, the
majority of which worked in its New York office.

3.    Among many others, Bovis provided services on
projects that included the United States Courthouse for the
Eastern District of New York, the United States Post
Office/Bankruptcy Court in Brooklyn, New York, Citifield, the
Bronx Criminal Courthouse ("BCC"), Grand Central Terminal, the
Deutsche Bank building deconstruction and various schools in New
Jersey's Abbott Districts (the "Abbott Schools projects").

II.  Bovis's Construction Contracts

4.    Bovis's role on construction projects was
typically that of a construction manager.  This often required
Bovis to supervise the work done by the subcontractors or trade
contractors involved.  As construction manager, Bovis usually
executed the "general conditions" contract.  The "general
conditions" contract included the infrastructure costs of the
construction project not covered by the trade contracts, such as
daily trash removal and operation of the elevators and hoists on
the construction site.  It also included supplying some union
labor, such as workers from the Mason Tenders' District Council
of Greater New York ("Local 79").

5.    The pay rates for Bovis's union labor were defined
by collective bargaining agreements.  For Local 79 laborers and
labor foremen on Bovis projects, the Contractors' Association of
Greater New York ("CAGNY") agreement was controlling.  The CAGNY

3

agreement provided that Local 79 labor foremen (the "Labor Foremen") were not paid for sick days, vacations or holidays not worked.

6.    In order to track union hours worked and bill clients for those hours, Bovis required the Labor Foreman for each project to fill out a single time sheet for the Foreman and the Foreman's crew on a weekly basis.  Thereafter, a Bovis superintendent reviewed the completed time sheet for accuracy and signed it.  Bovis used the hours listed on the time sheet to calculate the pay for the union workers and to send billing requisitions to Bovis's clients.

7.    Public projects and certain projects involving public funding required the submission of certified payrolls, which included sworn statements by Bovis representatives that the hours reflected in the billing requisitions accurately reflected the hours worked and paid by Bovis to its union workers.  Bovis generated the certified payrolls for Local 79 workers by using the same time sheets submitted by the Labor Foremen.

III. Bovis's Fraudulent Overbilling Scheme

8.    From at least 1999 through approximately June 2009, Bovis, together with others, devised a scheme to defraud federal, state and local government contracting agencies, as well as private clients, by falsely representing in billing requisitions, certified payrolls and other documents submitted by Bovis to agencies for public works contracts, and to its other

clients on private construction projects, that all of the hours for which Bovis billed its clients and paid its Labor Foremen were for hours actually worked when they were not.

9.    As part of the fraudulent scheme, from at least 1999 through approximately June 2009, Bovis had a systematic practice, employed on virtually all of its projects, of:

(a)   adding one to two hours of unworked overtime per day to the time sheets for Labor Foremen;

(b)   allowing Labor Foremen to be absent from work for sick days, major holidays and one or two weeks of vacation per year, while Bovis completed and submitted time sheets to its clients as though the Labor Foremen had worked those days;

(c)   making extra lump sum and stipend payments to a select group of Labor Foremen from April 2008 through June 2009; and

(d)   billing its clients for these unworked overtime hours, sick days, holidays and vacation days for which the Labor Foremen were paid as if the Labor Foremen had actually worked those hours and days, as well as the extra lump sum and stipend payments.

10.   Bovis regularly sent its clients bills that included these unworked hours via the mail or by private and commercial interstate carriers.  Bovis's clients were unaware that they were being billed for hours not actually worked, and Bovis knew of its clients' ignorance.  Bovis's clients paid Bovis

5

based on these fraudulently inflated bills, often via electronic
interstate wire.

IV.   The Minority Business Enterprise Schemes

     11.   Both the states of New York and New Jersey had
programs designed to increase the participation of small
construction firms and firms owned by women or minorities on
public construction projects.   These construction firms were
referred to as Minority Business Enterprises, Women Business
Enterprises and Small Business Enterprises (collectively,
"M/W/SBEs").   The government programs that were designed to
increase the participation of M/W/SBEs on public projects in New
York and New Jersey set goals for the percentage of work to be
awarded to M/W/SBEs on a particular project.

     12.   In New York state, pursuant to New York Executive
Law, a minority business is one in which the "minority ownership
has and exercises the authority to control independently the
day-to-day business decisions of the enterprise."   New York
Executive Law § 310(7)(c).   In New Jersey, at the time the
relevant contracts were entered into, the M/W/SBE program
established "goals" for the participation of M/W/SBEs, N.J. Stat.
Ann. § 52:32-21, and required M/W/SBEs to be independently owned,
operated and controlled, and such ownership and control had to be
"real, substantial, and continuing, demonstrating authority over
the affairs of the business[.]"   N.J. Stat. Ann. § 71:46-1.3.
While the state of New Jersey eliminated the minority and women-

6

owned portions of the program in 2003, all obligations with respect to the program that were incorporated into contracts for public construction projects remained intact.

A.   Bovis's Fraudulent M/W/SBE Scheme in Connection With the Bronx Criminal Courthouse Project

13.   In or about 2000, Bovis, together with others, devised a scheme to defraud a government contracting agency, specifically the Dormitory Authority of the State of New York ("DASNY"), by falsely representing in proposals and other documents submitted by Bovis to DASNY relating to the BCC project that H.J. Russell & Company ("HJR"), a M/W/SBE certified in New York, would perform 100 percent of the general conditions contract work that involved union labor, thereby substantially satisfying Bovis's M/W/SBE requirements.  Over the course of the project, from approximately 2000 through 2007, Bovis completed and submitted to DASNY monthly compliance reports confirming that HJR performed the general conditions union labor work under Bovis's contract in satisfaction of the M/W/SBE requirements.

14.   In fact, however, Bovis itself performed this work by directly managing the union labor that was supposed to be employed and supervised by HJR, and relegated HJR's role to a mere pass-through, thereby fraudulently enabling Bovis to get credit for compliance with its M/W/SBE obligations and to receive payments for its work on the project.  Bovis placed many of its long-term union employees on HJR's payroll, hired other union

labor that was then placed on HJR's payroll, supervised and directed the union workers itself, and made all important decisions relating to the general conditions union labor work. HJR's only function with respect to the general conditions union labor work was to provide paychecks for work performed by, or at the direction of, Bovis personnel.

15.   DASNY was not aware that Bovis was performing the work itself and relegating HJR's role to a mere pass-through. While Bovis paid HJR for the work HJR was supposed to be doing, Bovis's misrepresentations about the role of HJR were material because, pursuant to New York state law, DASNY would have rejected a contract with Bovis that failed to include a promise that Bovis meet the state's M/W/SBE obligations.  Bovis's intentional misrepresentations to DASNY about its compliance with the M/W/SBE requirements of the project caused DASNY to make payments via the mails and interstate wires from approximately 2000 through 2007.

B.   Bovis's Fraudulent M/W/SBE Scheme in Connection With the New Jersey Abbott Schools Projects

16.   In or about 2001, Bovis, together with others, devised a scheme to defraud the New Jersey Economic Development Authority ("EDA") and its successor organizations, the Schools Construction Corporation ("SCC") and the Schools Development Authority ("SDA"), all government contracting agencies (collectively, the "NJSDA"), with respect to the Abbott Schools

8

Program.  Bovis agreed in a contract with the NJ SDA that
Imperial Construction Group, Inc. and Imperial Architectural
Group (collectively "Imperial"), and Qualified Women/Minorities
in Construction ("QWIC") (collectively the "NJ M/W/SBEs"), which
were qualified M/W/SBEs in New Jersey, would be their principal
M/W/SBE partners to satisfy Bovis's obligation to have M/W/SBEs
perform 25 percent of Bovis's project management contract.
Bovis's identification of the NJ M/W/SBEs was material to the NJ
SDA's decision to award the project management contracts to
Bovis.

        17.  Over the course of the Abbott Schools projects,
Bovis submitted progress reports to the NJSDA declaring that
individuals from the NJ M/W/SBEs were performing work in
compliance with the contract terms.  In fact, however, although
it paid the NJ M/W/SBEs, Bovis itself performed this work and
relegated the roles of these M/W/SBEs to mere pass-throughs,
thereby fraudulently enabling Bovis to get credit for compliance
with its M/W/SBE obligations and to receive payments for its work
on the projects.

        18.  Bovis directed the NJ M/W/SBEs to hire various
individuals, some of whom were friends or relatives of Bovis
employees.  Some Bovis employees were also transferred to the NJ
M/W/SBEs' payrolls.  Although these employees received paychecks
from the NJ M/W/SBEs, their work was directed by Bovis, they had
Bovis identification and business cards and they often had little

9

or no contact with the NJ M/W/SBEs while working on the Abbott
Schools projects.

19.   In March 2004, Bovis and Imperial entered into two
"Staffing Secondment Agreements," pursuant to which fourteen
Bovis employees were transferred to Imperial for a period of ten
to twelve months.  As part of these contracts, the employees
remained on Bovis's payroll but were considered employees of
Imperial for the purpose of improperly allowing Bovis to count
these employees toward its M/W/SBE obligations.

20.   The NJSDA was not aware that Bovis used these NJ
M/W/SBEs as fraudulent pass-throughs.  Bovis's misrepresentations
regarding the amount of work performed by the NJ M/W/SBEs were
material because the NJSDA would have rejected contracts with
Bovis that did not include a commitment that Bovis would comply
with the state's M/W/SBE goals.  Bovis's intentional
misrepresentations to the NJSDA about its compliance with the
M/W/SBE requirements of the Abbott Schools projects caused the
NJSDA to make payments via the mails and interstate wires through
at least 2009.

10

COUNT ONE
(Conspiracy to Commit Mail and
Wire Fraud: Overbilling Scheme)

21.  The allegations contained in paragraphs 1 through

10 are realleged and incorporated as if fully set forth in this

paragraph.

22.  In or about and between January 1999 and June

2009, both dates being approximate and inclusive, within the

Eastern District of New York and elsewhere, the defendant LEND

LEASE (US) CONSTRUCTION LMB INC. (formerly BOVIS LEND LEASE LMB

INC.), together with others, did knowingly and intentionally

conspire to devise a scheme and artifice to defraud, and to

obtain money and property by means of materially false and

fraudulent pretenses, representations and promises, and for the

purpose of executing such scheme and artifice, (a) to place in

authorized depositories for mail matter to be delivered by the

United States Postal Service, and cause to be deposited to be

sent by private and commercial carriers, and taken and received

therefrom, mail matter, contrary to Title 18, United States Code,

Section 1341, and (b) to transmit and cause to be transmitted, by

means of wire communication in interstate and foreign commerce,

writings, signs, signals, pictures and sounds, contrary to Title

18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551

et seq.)

11

COUNT TWO
(Conspiracy to Commit Mail and Wire Fraud:
Bronx Criminal Courthouse)

23. The allegations contained in paragraphs 1 through 7 and 11 through 15 are realleged and incorporated as if fully set forth in this paragraph.

24. In or about and between 2000 and 2007, both dates being approximate and inclusive, within the Southern District of New York, the defendant LEND LEASE (US) CONSTRUCTION LMB INC. (formerly BOVIS LEND LEASE LMB INC.), together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, (a) to place in authorized depositories for mail matter to be delivered by the United States Postal Service, and cause to be deposited to be sent by private and commercial carriers, and taken and received therefrom, mail matter, contrary to Title 18, United States Code, Section 1341, and (b) to transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551 et seq.)

12

COUNT THREE
(Conspiracy to Commit Mail and Wire Fraud:
Abbott Schools Projects)

25.  The allegations contained in paragraphs 1 through 7, 11 through 12 and 16 through 20 are realleged and incorporated as if fully set forth in this paragraph.

26.  In or about and between 2001 and 2009, both dates being approximate and inclusive, within the District of New Jersey, the defendant LEND LEASE (US) CONSTRUCTION LMB INC. (formerly BOVIS LEND LEASE LMB INC.), together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, (a) to place in authorized depositories for mail matter to be delivered by the United States Postal Service, and cause to be deposited to be sent by private and commercial carriers, and taken and received therefrom, mail matter, contrary to Title 18, United States Code, Section 1341, and (b) to transmit and cause to be transmitted, by means of wire communication in interstate

13

and foreign commerce, writings, signs, signals, pictures and

sounds, contrary to Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 3551

et seq.)


LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK