# EXHIBIT D



## NON-PROSECUTION AGREEMENT BETWEEN HUNTER ROBERTS CONSTRUCTION GROUP, LLC AND THE UNITED STATES ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF NEW YORK

The UNITED STATES ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF NEW YORK (the "Office") and HUNTER ROBERTS CONSTRUCTION GROUP, LLC ("HUNTER ROBERTS"), by its undersigned President and Chief Executive Officer, James C. McKenna, and by its undersigned attorneys, Marc Agnifilo, Esq. and Andrea Zellan, Esq., all of whom are acting pursuant to authority granted by HUNTER ROBERTS's Board of Directors, hereby enter into this Agreement (the "Agreement").

### Introduction

1. The Office has informed HUNTER ROBERTS that since in or about December 2011, HUNTER ROBERTS has been the subject of a criminal investigation conducted by the Office; the Port Authority of New York and New Jersey, Office of Inspector General; the Federal Bureau of Investigation; the United States General Services Administration, Office of Inspector General; the United States Department of Labor, Office of Inspector General; and the New York City Department of Investigation (collectively, the "Investigating Agencies").

### Acceptance of Responsibility

2. HUNTER ROBERTS acknowledges that between 2006 and 2013 as a result of the conduct of certain individuals employed by HUNTER ROBERTS (hereinafter referred to as the "Unlawful Conduct"), HUNTER ROBERTS violated Title 18, United States Code, Sections 1001, 1341, 1343 and 1349, as set forth in the Joint Statement of Facts

(Attachment A, which is incorporated by reference herein), by engaging in a scheme to defraud federal, state and local government contracting and funding agencies, as well as private clients, by falsely representing, and otherwise making materially misleading statements and omissions, in billing requisitions, certified payrolls and other documents submitted by HUNTER ROBERTS to agencies for public works contracts, and to its other clients on private construction projects, that (i) all of the hours for which HUNTER ROBERTS billed its clients and paid its labor foremen of the Mason Tenders' District Council of Greater New York ("Local 79") were for hours actually worked when they were not; and (ii) that the hourly rates at which HUNTER ROBERTS billed its clients and paid its Local 79 labor foremen were in accordance with the terms of its contracts with clients and the Local 79 and the New York City District Council of Carpenters collective bargaining agreements, when they were not.

3.     HUNTER ROBERTS accepts responsibility to remediate its commission of the Unlawful Conduct by entering into this Agreement and by, among other things, continuing the proactive and remedial actions that HUNTER ROBERTS has taken to date, and HUNTER ROBERTS's continuing full cooperation with the Investigating Agencies as set forth in this Agreement.  This Agreement will be in effect for two years, to begin on the date of execution.

<u>Remedial & Other Measures</u>

4.     HUNTER ROBERTS represents that it has taken remedial measures in response to the Unlawful Conduct discovered in the course of the Office's investigation, and has taken additional measures, not in response to any Unlawful Conduct, designed to ensure

HUNTER ROBERTS's compliance with legal and regulatory requirements. These actions have included and will include:

(a) since in or about December 2011, after being served with a grand jury subpoena, HUNTER ROBERTS has fully cooperated with the Office's investigation, including by providing documents and making HUNTER ROBERTS's employees available for interviews upon request of the Office;

(b) conducting an exceptionally thorough internal investigation of the Unlawful Conduct described in Attachment A;

(c) promptly making a complete disclosure of, and accepting responsibility for, the full breadth of the Unlawful Conduct described in Attachment A;

(d) identifying HUNTER ROBERTS's officers and employees who were responsible for the Unlawful Conduct set forth in Attachment A and terminating them or securing their resignation;

(e) making relevant organizational changes, including: (i) creating the position of General Counsel, tasked with establishing and advising on ethical business practices; (ii) creating the position of Compliance Coordinator whose appointment and termination must be approved by its Board of Directors (or such successor as may be adopted hereafter), who reports to the General Counsel and has direct and full access to the Board of Directors, and whose responsibilities include monitoring compliance with union payroll and client billing policies; and (iii) forming an Executive Committee, to include HUNTER ROBERTS's Chief Executive Officer and President, General Counsel, and Financial Manager, whose members undergo integrity training and re-training at least once every six months;

(f)    revising the Code of Ethics and Time Sheet/Billing policies to require and ensure that: (i) union labor hours and hourly rates are accurately recorded on time sheets and clients are billed only for hours worked, and at rates in accordance with contracts and applicable collective bargaining agreements, unless specifically disclosed to, and approved by, the client in advance and in writing; and (ii) certified payrolls accurately reflect the hours worked by, and hourly rates of, all union labor;

(g)    providing effective training of the Code of Ethics and Time Sheet/Billing policies, including the requirements and revisions identified in paragraph 4(f) above, to all relevant HUNTER ROBERTS's officers and employees, and notifying union laborers used by HUNTER ROBERTS that only hours actually worked are permitted to be recorded on their time sheets; and

(h)    continuing the enforcement of enhanced union time sheet recording and billing procedures.  Specifically, HUNTER ROBERTS will, pursuant to formal written policy:

(i)    require that only hours actually worked be recorded on time sheets and paid to HUNTER ROBERTS's union workers;

(ii)   notify its subcontractors that only hours actually worked are permitted to be recorded on time sheets and paid to the subcontractors' union workers;

(iii)  require each of HUNTER ROBERTS's union workers to certify the accuracy of all hours recorded on his or her time sheets by signing them.  For projects that receive any public funding, each of the time sheets shall contain a warning that information provided on the time sheet will be provided to the government and that any false statement could constitute a violation of 18 U.S.C. § 1001, or the applicable state or local law analogue;

(iv)   require that each of HUNTER ROBERTS's union workers' time sheets be approved by the foreman as well as two additional levels of supervisors (e.g., superintendent and project manager) and that each of its foremen's time sheets be approved by two additional levels of supervisors;

(v)   require HUNTER ROBERTS's foremen, and any supervisors approving time sheets as described in subparagraph (iv) above, to maintain independent daily records to verify the accuracy of the time sheets;

(vi)   require HUNTER ROBERTS's foremen, and any supervisors approving time sheets as described in subparagraph (iv) above, to review time sheets with other project-related documents to verify the accuracy of hours entered; and

(vii)   prohibit HUNTER ROBERTS's payroll department from processing any time sheet that does not have the requisite approvals, except to the extent required to maintain compliance with applicable labor laws or collective bargaining agreements.

In addition, HUNTER ROBERTS will:

(viii)   train HUNTER ROBERTS's site superintendents, project managers and any other employees approving time sheets, as described in subparagraph (iv) above, on the requirements of a certified payroll on public works, or publically funded, projects; and

(ix)   maintain the Compliance Coordinator position, whose functions during the 24-month period of this Agreement will include verifying that the Time Sheet/Billing policies are being followed at all levels. The Compliance Coordinator will conduct regular visits to the project sites, observe actual procedures being followed at the sites, and inquire from union workers, site superintendents, project managers, and any other supervisors approving time sheets, as described in subparagraph (iv) above, about their actual implementation of the Time Sheet/Billing policies. The Compliance Coordinator will also conduct regular reviews of union members' hours in an attempt to spot

unexplained trends, anomalies or other indicia of fraud or inaccuracy. The Compliance Coordinator will report to the General Counsel. HUNTER ROBERTS will provide to the Office an update reporting the Compliance Coordinator's activities and findings every six months, or more often upon request of the Office, during the 24-month period.

(x)    Although the Office's investigation did not reveal any unlawful conduct concerning HUNTER ROBERTS's use of Minority Business Enterprises, Disadvantaged Business Enterprises, Women-Owned Business Enterprises and Small Business Enterprises (collectively, "MDWSBEs"), HUNTER ROBERTS represents that, in addition to its measures to remediate the Unlawful Conduct, it will implement additional controls concerning the use of MDWSBEs. The purpose of these additional controls is to ensure that HUNTER ROBERTS, and all MDWSBEs with which it has a subcontract, remain in compliance with all applicable rules and regulations, including but not limited to the requirement that MDWSBEs perform a "commercially useful function." Furthermore, these additional controls will include a training component for all managerial employees who oversee MDWSBEs, whether directly or indirectly.

## Continuing Obligation of Cooperation

5.    HUNTER ROBERTS acknowledges and understands that its prior, ongoing and future cooperation is an important and material factor underlying the Office's decision to enter into this Agreement, and therefore HUNTER ROBERTS agrees to cooperate fully and actively with the Office and the Investigating Agencies regarding any matter about which the Office or the Investigating Agencies may inquire.

6.    During the term of this Agreement, HUNTER ROBERTS agrees that its continuing cooperation shall include, but not be limited to, the following:

(a)     completely and truthfully disclosing all documents, materials or information in its possession about which the Office or the Investigating Agencies may inquire, including but not limited to all information about HUNTER ROBERTS's activities and those of its officers, employees and agents;

(b)     assembling, organizing and providing all documents, records and other evidence in its possession, custody or control, wherever located, as reasonably may be requested by the Office or the Investigating Agencies;

(c)     proactively disclosing to the Office all information concerning any criminal wrongdoing or suspected criminal wrongdoing of any kind, which has not yet been explicitly disclosed to the Office, and which is either currently in HUNTER ROBERTS's possession or which may come into its possession in the future, including conduct of the type alleged in this Agreement;

(d)     using its reasonable best efforts to make available its present and former officers and employees to provide information and/or testimony as requested by the Office and/or the Investigating Agencies, including sworn testimony before a grand jury or in court proceedings, as well as interviews with law enforcement authorities.  Cooperation under this paragraph shall include identification of witnesses who, to the knowledge of HUNTER ROBERTS, may have material information regarding the Unlawful Conduct, and providing records which may contain material information regarding the Unlawful Conduct. Nothing in this paragraph, however, creates or is intended to create any obligation by HUNTER ROBERTS to indemnify any current or former officer or employee.

(e)     providing testimony or information necessary to identify or establish the original location, authenticity, or other basis for admission into evidence of

records, documents or physical evidence in any criminal or other proceeding as requested by the Office;

(f)     with respect to any information, testimony, documents, records or physical evidence provided by HUNTER ROBERTS, consenting to any and all disclosures of such materials to the Office and the Investigating Agencies as the Office, in its sole discretion, deems appropriate. With respect to any such materials that constitute "matters occurring before the grand jury" within the meaning of Rule 6(e) of the Federal Rules of Criminal Procedure, HUNTER ROBERTS further consents to (i) any order sought by the Office permitting such disclosures, and (ii) the Office's ex parte or in camera application for such orders;

(g)     providing active assistance, including assistance by HUNTER ROBERTS's counsel, in connection with any investigation, criminal prosecution, civil trial or other legal proceeding brought by the Office.

7.    HUNTER ROBERTS agrees that it will continue to fulfill the cooperation obligations set forth in paragraph 6 above in connection with any investigation, criminal prosecution and/or civil proceeding brought by the Office relating to or arising out of the Unlawful Conduct set forth in Attachment A. HUNTER ROBERTS's obligation to cooperate is not intended to apply in the event that it is charged as a defendant in any criminal or civil proceeding. Notwithstanding the foregoing, HUNTER ROBERTS does not waive any privilege it may have with respect to any documents or other information now or hereafter subject to the attorney-client privilege, the attorney work-product doctrine or other recognized legal privilege, and nothing in this Agreement shall be construed or is intended to require HUNTER ROBERTS to waive any such privilege.

<u>Payment of Restitution</u>

8.     In addition to any payments required in connection with any current or future non-criminal proceedings by agencies not party to this Agreement or by branches of the Department of Justice other than the Office, HUNTER ROBERTS agrees to make restitution to the victims of the scheme identified in Attachment A as set forth below. HUNTER ROBERTS will make an offer of restitution to each of the victims in the amounts agreed to by the parties and cumulatively totaling $1,007,045.52. To the extent that HUNTER ROBERTS has already made restitution payments, those payments will be deducted from the offers of restitution to be made:

(a)     Within 30 days of the date of execution of this Agreement, HUNTER ROBERTS will contact each victim that is eligible for restitution via letter, the contents of which must be approved by the Office. HUNTER ROBERTS will advise each victim that restitution is available in the amount agreed to by the parties.

(b)     To the extent that any victim declines to claim the offered restitution within 12 months of the date of execution of this Agreement, HUNTER ROBERTS will be absolved of this Agreement's requirement to pay such restitution and may retain any unclaimed portion.

<u>Payment of a Financial Penalty to the United States</u>

9.     In addition to any payments required in connection with any current or future non-criminal proceedings by agencies not party to this Agreement or by branches of the Department of Justice other than the Office, and in addition to the restitution obligation set forth in paragraph 8, HUNTER ROBERTS agrees to pay $6,000,000 as a financial penalty as directed by the Office. HUNTER ROBERTS agrees to pay the penalty according

to the following schedule: the first $2 million payment within 90 days of the date of the

execution of this Agreement; the second $2 million within one year of the date of the

execution of this Agreement; and the remaining balance within two years of the execution of

this Agreement.

Consequences of Breach & Additional Terms

10.     In consideration of HUNTER ROBERTS's (i) acceptance of

responsibility to remediate HUNTER ROBERTS's Unlawful Conduct as set forth in

Attachment A; (ii) cooperation to date and agreement to continue to cooperate with the

Office and the Investigating Agencies as described in paragraphs 6 and 7; (iii) agreement to

make restitution available to victims as set forth in paragraph 8; (iv) payment of a financial

penalty to the United States of America as set forth in paragraph 9; (v) compliance in the

future with all applicable laws, including federal, state and local construction contracting

laws and regulations; and (vi) agreement otherwise to comply with all of the terms of this

Agreement, the Office will not:

(a)     Institute or pursue any criminal charges against HUNTER ROBERTS
arising out of the Unlawful Conduct; or

(b)     Pursue any civil claims against HUNTER ROBERTS, including but not
limited to causes of action pursuant the federal False Claims Act, based
on the Unlawful Conduct.

This non-prosecution provision binds only the Office. The Office shall bring this Agreement

to the attention of other prosecuting or regulatory agencies, including licensing, inspecting,

monitoring or compliance bodies, at HUNTER ROBERTS's request.

11.     HUNTER ROBERTS understands and agrees that should the Office, in

its sole discretion, determine that HUNTER ROBERTS has deliberately given materially

false, incomplete, or misleading information pursuant to this Agreement, has committed any crimes subsequent to the date of this Agreement or has otherwise deliberately violated any provisions of this Agreement, then HUNTER ROBERTS will be subject to prosecution for any crimes of which the Office has knowledge and jurisdiction to prosecute, including prosecution relating to the Unlawful Conduct. HUNTER ROBERTS agrees that in the event of such a determination by the Office, any prosecution relating to the Unlawful Conduct that is not time-barred by the applicable statute of limitations on the date of this Agreement, including by reason of tolling agreements between the Office and HUNTER ROBERTS entered on January 1, 2014, may be commenced against HUNTER ROBERTS between the date of signing of this Agreement and two years after that date, notwithstanding the expiration of any statute of limitations prior to the end of that two-year period. By this Agreement, HUNTER ROBERTS expressly intends to and does waive any and all rights in this respect. This waiver by HUNTER ROBERTS is knowing, voluntary and made after consultation with counsel. Moreover, the commission of an additional crime by HUNTER ROBERTS shall constitute a breach of this Agreement.

12.     Furthermore, it is agreed that if the Office, in its sole discretion, determines that HUNTER ROBERTS has committed any crime or otherwise violated any provision of the Agreement within two years from the date of the execution of this Agreement: (i) all statements by or on behalf of HUNTER ROBERTS to the Office and/or the Investigative Agencies, or other designated law enforcement or regulatory officials, including but not limited to the statements regarding the Unlawful Conduct set forth in Attachment A, testimony given by any agent of HUNTER ROBERTS before a grand jury or other tribunal, whether prior to or subsequent to the signing of this Agreement, and any leads

derived from such statements or testimony, shall be admissible in any and all criminal proceedings hereafter brought against HUNTER ROBERTS; (ii) HUNTER ROBERTS shall not assert any claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other rule or provision that statements made by or on behalf of HUNTER ROBERTS prior to or subsequent to this Agreement, or any leads therefrom, should be suppressed; and (iii) in the event of such a determination by the Office, HUNTER ROBERTS shall waive indictment and proceed by felony information in connection with a prosecution of HUNTER ROBERTS brought by the Office. However, nothing in this Agreement shall constitute a waiver of any Confrontation Clause rights HUNTER ROBERTS may have under the Sixth Amendment to the United States Constitution.

  13. HUNTER ROBERTS agrees that it is within the sole discretion of the Office to decide whether conduct or statements of any individual will be imputed to HUNTER ROBERTS for the purpose of determining whether HUNTER ROBERTS has knowingly, intentionally and materially violated any provision of this Agreement. If the Office determines that HUNTER ROBERTS has committed a knowing, intentional and material breach of any provision of the Agreement, the Office shall provide written notice of the alleged breach to HUNTER ROBERTS, through its counsel, Marc Agnifilo, Esq. and Andrea Zellan, Esq., Brafman & Associates, 767 Third Avenue, 26th Floor, New York, New York 10017, or to any successor counsel that HUNTER ROBERTS may designate, and provide HUNTER ROBERTS with a two-week period from the date of receipt of such notice in which to make a presentation to the Office, or its designee, to demonstrate that no breach has occurred, or, to the extent applicable, that the breach was not knowing, intentional or

material, or has been cured. Upon request by HUNTER ROBERTS, the Office may, in its sole discretion, agree in writing to extend this two-week period, including to provide HUNTER ROBERTS with an opportunity to cure any breach of this Agreement. The parties to this Agreement expressly understand and agree that if HUNTER ROBERTS fails to make a presentation to the Office, or its designee, within the two-week period (or other period agreed to by the Office), the Office may, in its sole discretion, conclusively presume that HUNTER ROBERTS is in knowing, intentional and material breach of this Agreement.

14.     HUNTER ROBERTS agrees that it shall not, through its attorneys, Board of Directors (or such successor as may be adopted hereafter), agents or employees, make any public statement, in litigation or otherwise, contradicting its acceptance of responsibility to remediate HUNTER ROBERTS's Unlawful Conduct as set forth in Attachment A. Any such contradictory statement by HUNTER ROBERTS, its present or future attorneys, directors, agents, or employees shall constitute a breach of this Agreement and HUNTER ROBERTS thereafter shall be subject to prosecution as specified in paragraphs 11 through 13. The decision as to whether any such contradictory statement will be imputed to HUNTER ROBERTS for the purpose of determining whether HUNTER ROBERTS has breached this Agreement shall be at the sole discretion of the Office. Upon receipt of notification by the Office of any such contradictory statement, HUNTER ROBERTS may avoid a finding of a breach of this Agreement by publicly repudiating such statement within three (3) business days after receipt of notice by the Office. This paragraph shall not apply to any statement made by any current or former HUNTER ROBERTS officer or employee who has been charged with a crime or other wrongdoing by the Office, or by any other federal, state or local agency.

15.  The parties understand and agree that the exercise of discretion by the Office or its designee is not subject to review in any court or tribunal.

16.  Except to the extent permitted by the Office, HUNTER ROBERTS agrees that if, during the term of this Agreement, it sells or merges all or substantially all of its business operations as they exist as of the date of this Agreement to or into a single purchaser or a group of affiliated purchasers, HUNTER ROBERTS shall include in any contract for sale, plan of reorganization, or merger, a provision binding the purchaser/successor to HUNTER ROBERTS's obligations described in this Agreement, provided however that the obligations imposed by this Agreement will not extend to the governance and operation of a purchasing or investing entity that acquires some or all of HUNTER ROBERTS's stock, as long as that entity maintains HUNTER ROBERTS as a separate corporate entity. The Office agrees that if a mortgagee, or any other secured creditor or successor interest holder, that is wholly independent of HUNTER ROBERTS's current Board of Directors (or such successor as may be adopted hereafter), officers, employees and shareholders takes ownership of HUNTER ROBERTS through foreclosure, the obligations imposed by this Agreement will not extend to that mortgagee, secured creditor or successor interest holder.

17.  It is understood that the Agreement is binding on HUNTER ROBERTS and the Office, but specifically does not bind any other Federal agencies, any state or local law enforcement agencies, or any licensing or regulatory authorities. However, if requested by HUNTER ROBERTS or its attorneys, the Office will bring to the attention of any such agencies, including but not limited to any licensing authorities, this Agreement, HUNTER ROBERTS's cooperation and its compliance with its obligations under this Agreement, and

any reforms specified in this Agreement. It is the intent of the parties to this Agreement that this Agreement does not confer or provide any benefits, privileges or rights to any individual or entity other than the parties hereto, and that this Agreement, including its attachments, shall be admissible in any proceeding brought by the Office. Moreover, HUNTER ROBERTS may raise defenses or assert affirmative claims in any civil proceedings brought by private parties as long as doing so does not otherwise violate any term of this Agreement.

18.     Except as set forth herein, this Agreement in no way limits or affects any right, including right of inspection and/or enforcement, held by the United States or any other governmental body, pursuant to applicable federal, state, or local laws, regulations, or permits. In addition, nothing herein shall be read in any way to alter, affect, abrogate, or impair the ability and obligation of the United States to take any investigative or enforcement action for any future conduct, including but not limited to any administrative, civil, or criminal enforcement action, or to make any inquiry of HUNTER ROBERTS concerning any present or future alleged violation of federal law, regulation, or order.

19.     This Agreement sets forth all the terms of the agreement between HUNTER ROBERTS and the Office. No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Office, HUNTER ROBERTS's attorney, and a duly authorized representative of HUNTER ROBERTS. This Agreement supersedes all prior promises, agreements or conditions between the parties, except for the tolling

agreement entered into on January 1, 2014. To become effective, this Agreement must be signed by all signatories listed below. This Agreement may be signed in counterparts.

Dated: Brooklyn, New York
May 18, 2015

KELLY T. CURRIE
Acting United States Attorney
Eastern District of New York

By: _____
Whitman G.S. Knapp
Assistant United States Attorney
Jonathan P. Lax
Special Assistant United States Attorney

Approved By:

_____
Winston M. Paes
Chief, Business & Securities Fraud Section

Agreed and Consented To By:
HUNTER ROBERTS CONSTRUCTION
GROUP, LLC

By: _____
James C. McKenna
President and Chief Executive Officer

Approved By:
BRAFMAN & ASSOCIATES
Attorney for Hunter Roberts

By: _____
MARC AGNIFILO, Esq.
ANDREA ZELLAN, Esq.
767 Third Avenue, 26th Floor
New York, New York 10017

ATTACHMENT A TO NON-PROSECUTION AGREEMENT BETWEEN
HUNTER ROBERTS CONSTRUCTION GROUP, LLC AND THE UNITED
STATES ATTORNEY'S OFFICE FOR THE EASTERN DISTRICT OF NEW YORK

## JOINT STATEMENT OF FACTS

HUNTER ROBERTS CONSTRUCTION GROUP, LLC, ("HUNTER ROBERTS"), a Delaware limited liability company qualified to do business in the State of New York, by James C. McKenna, in his capacity as President and Chief Executive Officer of HUNTER ROBERTS and acting pursuant to authority granted by HUNTER ROBERTS's Board of Directors, hereby stipulate and agree that the following facts are true:

### Hunter Roberts Construction Group

1.      HUNTER ROBERTS was a construction service corporation that provided construction, project management and consulting services on large-scale public and private construction projects. HUNTER ROBERTS was founded in 2005 and rapidly grew to become one of the largest construction firms in New York City. HUNTER ROBERTS operated primarily in the northeast region of the United States, with its largest office in New York City. In 2012, HUNTER ROBERTS had over 200 employees, the majority of which worked in its New York office.

2.      Among many others, HUNTER ROBERTS provided services on projects that included the Dormitory Authority of the State of New York's Queens Hospital Center Ambulatory Care Pavilion, the Harvey Theater at the Brooklyn Academy of Music, the Borough of Manhattan Community College's Fiterman Hall, and the PAVE Academy Charter School in Red Hook, Brooklyn.

## Hunter Roberts's Construction Contracts

3.      The pay rates for HUNTER ROBERTS's union labor were defined by collective bargaining agreements that were negotiated and entered into with the Cement League on HUNTER ROBERTS's behalf.  HUNTER ROBERTS renegotiated the provisions of these agreements and entered into successor agreements with the Cement League approximately every three years (collectively, these agreements are referred to herein as the "Cement League Agreement").  At all times relevant to this Joint Statement of Facts, the Cement League Agreement governed the pay rates of workers from the Mason Tenders' District Council of Greater New York ("Local 79"), including Local 79 foremen (the "Labor Foremen").  Specifically, the Cement League Agreement provided that the Labor Foremen were: (i) guaranteed a particular hourly rate of pay, but (ii) not to be paid on sick days, vacation days or unworked holidays.  The Cement League Agreement also governed the pay rates of workers from the New York City District Council of Carpenters ("Local 157"), including Local 157 foremen (the "Carpenter Foremen").

4.      HUNTER ROBERTS's role on construction projects was typically that of a construction manager.  This often required HUNTER ROBERTS to supervise the work done by the subcontractors or trade contractors involved.  As construction manager, HUNTER ROBERTS usually executed the construction management contract, which governed the "general conditions" costs.  The "general conditions" costs included the infrastructure costs of the construction project not covered by trade contracts, such as daily trash removal and operation of the elevators and hoists on the construction site.  It also included supplying Local 79 workers including the Labor Foremen.

5.     The terms of the construction management contract, which governed the "general conditions" costs, required HUNTER ROBERTS to: (i) bill clients for work actually performed by the Labor Foremen at the pay rates specified in the Cement League Agreement (the "General Conditions Contract Rate"), or (ii) seek prior approval from clients to bill Labor Foremen or Carpenter Foremen at pay rates in excess of the General Conditions Contract Rate.

6.     In order to track union hours worked and bill clients for those hours, HUNTER ROBERTS required the Labor Foremen for each project to fill out a single time sheet for the Labor Foreman and the Labor Foreman's crew on a weekly basis. Thereafter, a HUNTER ROBERTS superintendent was supposed to review the completed time sheet for accuracy and either sign it or present it to a project manager for signature. HUNTER ROBERTS used the hours listed on the time sheet to calculate the pay for the union workers and to send billing requisitions to HUNTER ROBERTS's clients.

7.     Public projects and certain projects involving public funding required the submission of certified payrolls, which included sworn statements by HUNTER ROBERTS representatives that the hours reflected in the billing requisitions accurately reflected the hours worked and paid by HUNTER ROBERTS to its union workers. HUNTER ROBERTS generated the certified payrolls for Local 79 workers by using the same time sheets submitted by the Labor Foremen.

## Hunter Roberts's Fraudulent Overbilling Scheme

8.     From approximately 2006 through November 2013, HUNTER ROBERTS, together with others, devised a scheme to defraud federal, state and local government contracting and funding agencies, as well as private clients, by falsely

representing, and otherwise making materially misleading statements and omissions in billing requisitions, certified payrolls and other documents submitted by HUNTER ROBERTS to agencies for public works contracts, and to its other clients on private construction projects, that: (i) all of the hours for which HUNTER ROBERTS billed its clients and paid its Labor Foremen were for hours actually worked when they were not; and (ii) that the hourly wage rates at which HUNTER ROBERTS billed its clients for the work of all of its Labor Foremen and Carpenter Foremen were in accordance with the General Conditions Contract Rate when they were not.

9.     As part of the fraudulent scheme, from approximately 2006 through 2011, HUNTER ROBERTS maintained a systemic practice, employed on virtually all of its projects, of:

(a)     adding one to two hours of unworked or unnecessary "guaranteed" overtime per day to the time sheets for Labor Foremen;

(b)     providing four hours of guaranteed overtime per day, whether worked or not, for one senior Labor Foreman; and

(c)     allowing Labor Foremen to be absent from work for sick days, major holidays and one or two weeks of vacation per year, while HUNTER ROBERTS completed and submitted time sheets to its clients as though the Labor Foremen had worked those days.

10.     As further part of the scheme, from approximately 2010 to November 2013, for a select group of Labor Foremen and one senior Carpenter Foreman, HUNTER ROBERTS, without seeking approval from its clients, billed its clients and paid those Labor

Foremen and the Carpenter Foreman at wage rages that exceeded the General Conditions Contract Rate.

11.     During the time periods specified in paragraphs 9 and 10, above, HUNTER ROBERTS regularly used the United States mail, or private and commercial interstate carriers, to send clients bills that included unworked and unnecessary hours and above-scale rates.  HUNTER ROBERTS knew that its clients were unaware: (i) that they were being billed for hours not actually worked, and (ii) that the hourly rates they were being billed for certain foremen exceeded the General Conditions Contract Rate.  HUNTER ROBERTS's clients paid HUNTER ROBERTS based on these fraudulently inflated bills, often via electronic interstate wire.

## Hunter Roberts's Reforms

12.　HUNTER ROBERTS has instituted various reforms related to its union payroll, time sheet and billing procedures, which reforms would have likely deterred or prevented this scheme, had those reforms been in place in 2006.

Dated:　　Brooklyn, New York

　　　　　　_____, 2015

　　　　　　　　　　　　　　　HUNTER ROBERTS CONSTRUCTION
　　　　　　　　　　　　　　　GROUP, LLC

　　　　　　By:　_____
　　　　　　　　　James C. McKenna
　　　　　　　　　President and Chief Executive Officer


　　　　　　　　　　　　　　　Approved By:
　　　　　　　　　　　　　　　BRAFMAN & ASSOCIATES
　　　　　　　　　　　　　　　Attorney for Hunter Roberts

　　　　　　By:　_____
　　　　　　　　　MARC AGNIFILO, Esq.
　　　　　　　　　ANDREA ZELLAN, Esq.
　　　　　　　　　767 Third Avenue, 26th Floor
　　　　　　　　　New York, New York 10017

## Secretary's Certificate of Board of Directors' Approval of Agreement

1.  I certify that I am the Secretary of Hunter Roberts Construction Group LLC, a Delaware limited liability company (the "Company"), and I have been appointed and am presently serving in the capacity of Secretary of the Company.

2.  I further certify that, at a meeting of the board of directors of the Company held on the May 19, 2015, the following resolutions were adopted by a majority of the board:

    > **RESOLVED,** that the Non-Prosecution Agreement between the Company and the United States Attorney's Office for the Eastern District of New York is hereby authorized and approved.

    > **FURTHER RESOLVED,** that the Attachment A to the Non-Prosecution Agreement between the Company and the United States Attorney's Office for the Eastern District of New York -- Joint Statement of Facts is hereby authorized and approved.

    > **FURTHER RESOLVED,** that the Company is authorized to enter into the Non-Prosecution Agreement and Attachment A thereto, and that the Chief Executive Officer be, and hereby is authorized, in the name of and on behalf of the Company, to negotiate, execute and deliver such agreement in substantially the form provided to the Board, and to execute additional documents or certificates and take such other action that is necessary or appropriate to give full effect to such agreement.

3.  The resolutions are presently in full force and effect and have not been revoked or rescinded as of this date.

_____
John Alicandri
Secretary

The undersigned herby certifies that John Alicandri is the Secretary of Hunter Roberts Construction Group LLC and is authorized to deliver this certificate.

_____
James C. McKenna
President and Chief Executive Officer

Dated: May 19, 2015